Robert Anthony **MURRAY**, Appellant,

v.

Paul K. **DELO**, Appellee.

No. 91–2542.

United States Court of Appeals,
Eighth Circuit.

Submitted April 13, 1994.

Decided Sept. 6, 1994.

Rehearings and Suggestions for Rehearing En Banc Denied Nov. 25, 1994.

** The Honorable Joseph E. Stevens, Jr., Chief Judge, United States District Court for the Western District of Missouri, sitting by designation.

Richard Holland Sindel, Clayton, MO, argued (Connie Francis and Cheryl Rafert, on the brief), for appellant.

Michael Joseph Spillman, Asst. Atty. Gen., Jefferson City, MO, argued (Ronald L. Jurgeson, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

This petition is Robert Anthony Murray's first for federal habeas corpus relief. The murder of which he was convicted occurred nine years ago, on December 6, 1985, in Missouri. A jury convicted Murray of two counts of first-degree murder under Mo.Rev. Stat. § 565.020 (1986) for the killing of two robbery victims, Jeffrey Jackson and Craig Stewart, and sentenced him to death on both counts. In this petition, Murray raises a number of claims, all of which the District Court rejected, and we address each in turn. We conclude that each issue Murray raises in this petition is either procedurally barred or without merit for some other reason; therefore, we affirm.

I.

Before addressing the merits of Murray's claims, we summarize the procedural history of this case. After trial, the Missouri Supreme Court affirmed Murray's convictions and sentence on direct appeal. *State v. Murray*, 744 S.W.2d 762 (Mo.), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). Murray then filed a state-court motion to set aside or vacate judgment and sentence pursuant to Mo.Sup.Ct.R. 29.15, which was denied after an evidentiary hearing. The Missouri Supreme Court affirmed the denial of post-conviction relief. *Murray v. State*, 775 S.W.2d 89 (Mo.1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1171, 107 L.Ed.2d 1073 (1990).

Murray next filed a pro se petition for a writ of habeas corpus in the United States District Court for the Eastern District of Missouri. That Court appointed counsel to represent Murray, and counsel then filed two amended petitions. After reviewing those petitions, the District Court issued an order denying the writ on the merits. *Murray v. Delo*, 767 F.Supp. 975 (E.D.Mo.1991). Petitioner's counsel filed a notice of appeal to this Court. Then, before briefing, the petitioner filed, pro se, motions to discharge his court-appointed counsel, for appointment of new counsel, to remand to the District Court, and for leave to file an amended petition. In support of these motions, Murray argued that the lawyer responsible for filing the two

amended petitions had never communicated with him and had filed the petitions without his authorization or participation. On November 13, 1991, we granted the motions and appointed new counsel. Murray filed a third amended petition, which, after review, the District Court denied. *Murray v. Delo,* No. 90-370C(8) (E.D.Mo., August 23, 1993). Murray now appeals from this order.

Meanwhile, on August 20, 1992, Murray filed a petition for writ of habeas corpus under Mo.Sup.Ct.R. 91 and a motion to recall the mandate of that Court. On September 22, 1992, the Supreme Court of Missouri denied the habeas corpus petition and rejected the motion to recall the mandate.

After a brief discussion of the facts of this case, we address each of Murray's arguments. We take the facts from the Missouri Supreme Court opinion. *State v. Murray,* 744 S.W.2d 762. That Court's recitation of the facts is supported by the evidence introduced at the trial.

## II.

Claudia Hennings and Gladys Nutall went to Jeffrey Jackson's St. Louis apartment sometime after 11:00 p.m. on December 5, 1985. Jackson's friend, Craig Stewart, was also present at the apartment.

Hennings, Nutall, Jackson, and Stewart drank alcohol, smoked marijuana, and took cocaine while watching television. Sometime after midnight, William Murray, the defendant's older brother, arrived at the apartment and talked with Jackson in a bedroom. Shortly thereafter, William left the apartment. He returned a half hour later and pulled a gun. He told everyone that this was a holdup and to get on the floor. While Hennings, Nutall, Jackson, and Stewart were lowering themselves to the floor, Robert Murray and a third person entered the apartment. Robert Murray was carrying a gun and wearing a ski mask.

Hennings had known William Murray for eight years and considered him to be her best friend; she had also known the defendant for eight years. When she heard Robert Murray speak, she recognized his voice.

She told him so and told him to remove his mask. He rolled the mask up.

William asked Jackson what he had in the house, and Jackson told him to look in the dresser in the bedroom. William and the third participant searched the entire apartment, constantly asking the victims for money or guns. While William searched, the defendant held a gun on the four victims. William took Nutall's purse and Stewart's wallet, and Robert took Hennings's purse and Jackson's wallet. Although they dumped the contents of all of these items into a pillowcase, they told the victims that the money was insufficient. They demanded more money and asked whether anyone else would be coming to the apartment. Jackson told William that Tracy Adams would be coming by around 3:15 a.m. to take him to work. William asked Jackson if Adams would have any money or guns with him, and Jackson said he did not know. William and the others decided to wait for Adams and kept the victims on the floor.

After several hours had passed, William kicked Nutall in the side. He then took her into the kitchen, raped her, and sent her back into the living room. While she was being raped, Nutall saw the defendant looking in from the living room at her and William. In addition, the defendant sexually assaulted Hennings by rubbing her genital area.

Shortly thereafter, the Murrays tied Jackson's and Stewart's hands behind their backs, and gagged and blindfolded them. Then, Robert Murray went into the kitchen and found a butcher knife and some steak knives. The assailants took Jackson and Stewart into the kitchen, placed them on their knees, and began hitting them. Throughout the beating, the Murrays repeatedly said that the money they had found was not enough and demanded more. Then, the Murrays picked up the knives and began stabbing them into the floor around Jackson and Stewart.

Hennings, who was watching the assaults from the living room, got up off the floor and attempted to jump out a window. The defendant caught her, told her not to try it again or he would cut her throat, and ordered her back to the floor. When the defendant

turned around to return to the kitchen, Hennings ran into the bedroom and slammed the door closed. She then threw herself through the closed second-floor window, landing on the grass outside, where she heard gunshots. Hennings ran down the street screaming and called the police from a neighbor's house.

Meanwhile, one of the assailants had discovered that Hennings was gone and returned to the kitchen to inform the others. Nutall then looked into the kitchen and saw Robert Murray hold Stewart up and shoot him in the back. She ran out of the apartment to a nearby grocery store, where she told a security guard that a man had been shot in the apartment.

During the time of Nutall's escape, the police responded to Hennings's phone call. She told them that Robert and William Murray were two of the assailants and provided descriptions. The police also responded to the call from the security guard. Both women returned to the apartment with the police and discovered that Jackson and Stewart were dead in the kitchen. Each man had been shot twice in the back. Three bullets were recovered from the bodies, and analysis indicated that all three were fired from the same gun.

The day after the incident, the police went to Robert Murray's home and arrested him. After being given his *Miranda* rights, he denied being present at the apartment. Later that night, Nutall identified the defendant in a lineup, and told the police that he was the man she saw shoot Stewart. After the police informed the defendant that he had been identified, he admitted having been in the apartment, but said that he left before the shooting began. After being read his rights again, he told the police that he did not bind, gag, shoot, or kill anyone. According to the police, he made this statement before being told any details about the victims' treatment.

We now turn to the legal issues raised on appeal.

### III.

### A.

Before we consider other issues, we must first address the impact of our order remanding the case to the District Court and appointing new counsel on the District Court's authority to address the merits of the issues raised in the amended petition (filed by newly appointed counsel). Murray argues the District Court erred when it determined that some of the claims he raised in his third amended petition were procedurally barred as abusive under 28 U.S.C. § 2254, Rule 9(b). The State argues that any issues raised in the third amended petition which were not included in the other two amended petitions are barred by the abuse-of-the-writ doctrine.

The abuse-of-the-writ doctrine generally prohibits a petitioner from raising claims in a subsequent habeas petition that could have been, but were not, raised in the first federal habeas proceeding. *McCleskey v. Zant*, 499 U.S. 467, 490, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991). The general bar against abusive claims also extends to successive claims which raise grounds identical to those heard and decided on the merits in a previous petition, *Sawyer v. Whitley*, — U.S. —, —, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992). The respondent bears the initial burden of pleading abuse of the writ, and, once he or she does so, the petitioner bears the burden of proving that no abuse has occurred. *McCleskey, supra,* 499 U.S. at 494, 111 S.Ct. at 1470. Normally, once the state pleads abuse of the writ as a defense, a court must determine why the issue was not raised in an earlier petition. *Smith v. Armontrout*, 888 F.2d 530, 540 (8th Cir.1989). Examples of the types of issues which are prohibited under the abuse-of-the-writ doctrine include grounds for relief which were deliberately withheld or which were not filed by competent counsel. *Id.* at 540–41. Dismissal of a petition can be avoided if the earlier petition "was filed and litigated without [petitioner's] knowledge, participation, or authorization[.]" *Ibid.* (citations omitted).

The Supreme Court has carved out two types of exceptions to the general bar against successive writs. To qualify for the first exception, a petitioner must show cause for failing to raise the claim in an earlier petition, as well as prejudice resulting from

that failure. *McCleskey v. Zant, supra,* 499 U.S. at 494, 111 S.Ct. at 1470. A court may also proceed to decide the claim on the merits if the defendant is actually innocent of the crime itself or of the sentence. *Herrera v. Collins,* —— U.S. ——, ——, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993). To qualify for this exception, the defendant must prove by clear and convincing evidence that "but for [a] constitutional error, no reasonable juror" would have convicted him of the crime in question or found him eligible for the sentence at issue. *Sawyer v. Whitley, supra,* —— U.S. at ——, 112 S.Ct. at 2523. The scope of the actual-innocence exception is very narrow. See *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); *McCleskey v. Zant, supra.* The inquiry for this Court is not "whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins, supra,* —— U.S. at ——, 113 S.Ct. at 861.

■ Murray's new counsel filed a third amended petition, the fourth petition overall, with the District Court. This petition raised several issues which were not included in the pleadings before the District Court when it issued the original order denying Murray's writ. The District Court held that any claims that had also been raised in the third petition were barred as successive, and that any new claims raised in the fourth petition were barred as abusive, under 28 U.S.C. § 2254, Rule 9(b).[1] Moreover, the District Court held that Murray could not qualify for any of the exceptions to the abuse-of-the-writ doctrine. We disagree.

When we remanded the case to the District Court, we did so on the basis of a pro se motion filed before this Court asking us to dismiss Murray's court-appointed counsel. The essence of Murray's motion before this Court was that his lawyer was not communicating with him and had not raised all of the issues before the District Court which Murray wanted raised. In sending the case back to the District Court, our intention was for a new court-appointed counsel to plead and present all of the issues together in one petition. The purpose of appointing new counsel and remanding the case was to correct the problems created by the first court-appointed lawyer, and to ensure that the District Court reviewed, on the merits, all of the claims Murray raised which he had not already defaulted by the time he reached the federal habeas corpus stage.

■ This case can be distinguished from other cases in which this Court has held that grounds for relief, raised for the first time in motions filed after a district court has entered a final order, abuse the writ. Compare *Bannister v. Armontrout,* 4 F.3d 1434, 1445 (8th Cir.1993); *Blair v. Armontrout,* 976 F.2d 1130, 1134 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2357, 124 L.Ed.2d 265 (1993). This case is one of the "rare" cases in which dismissal for abuse of the writ was improper, because petitions two and three were filed and litigated without Murray's knowledge and participation. *Smith v. Armontrout, supra,* 888 F.2d at 541. In federal habeas cases brought by prisoners in state custody who have been sentenced to death, appointment of counsel is required by statute. 21 U.S.C. § 848(q)(4)(A), part of the Anti–Drug Abuse Amendments of 1988. We do not think Congress had in mind a lawyer who would not communicate with his or her client, or who would file a petition without consultation with or authorization from the client. To attribute legal effect to such a lawyer's omission of claims the client wished to raise, would be both unfair in itself and inconsistent with the purpose of the statute making appointment of counsel mandatory. Such a result would almost make nugatory our order of remand, the whole purpose of which was to let Murray start over again with a clean slate and adequate counsel.

The State points out that *McCleskey v. Zant, supra,* the main Supreme Court opinion summarizing the current state of the law on abuse of the writ, mentions no "exception" for cases involving inattentive or uncooperative lawyers. We think it would be a mistake to read *McCleskey* as a comprehensive stat-

---

1. These holdings were in the alternative. The District Court helpfully went on to address Murray's claims on the assumption that they were not barred as abusive or successive.

ute-like codification. It lays down general principles. It is no deviation from those principles to say, as we did in, *e.g.*, *Smith v. Armontrout, supra,* that abuse of the writ is not a defense where the former petition was filed without the knowledge, participation, or authorization of the client. We hold that abuse of the writ is no defense to those claims newly included in the third amended petition.

██ The case of those claims in the third amended petition that *were* included in the petitions previously adjudicated by the District Court is even clearer. We can see why *that* Court would not feel called upon to redecide claims it had already fully addressed. But on no tenable theory could *this* Court be barred from appellate review of the District Court's dismissal of those claims. Our remand order was entered before we reviewed the substance of the District Court's decision on the former petitions. Murray is entitled by statute, 28 U.S.C. § 1291, to an appeal as of right from that decision. The fact that a remand took place to allow him to obtain competent counsel, and that that new lawyer chose to include in the third amended petition some of the same claims previously pleaded (perhaps fearing that omitting them could be taken as some sort of waiver), is no reason whatever to hold that we cannot now review the District Court's disposition of the repeated claims.

We hold that Murray's third amended petition is not subject to an abuse-of-the-writ defense, and we turn to the substance of his claims.

## B.

██ Murray argues that his conviction and sentence were based on the perjured testimony of the state's two principal witnesses, Hennings and Nutall, and that this constitutes a violation of his constitutional rights. The District Court held that this issue was procedurally barred, and we agree.[2] Murray's state-court petitions did not raise this issue, and, as a result, we cannot address it

unless Murray can qualify for one of the exceptions to the procedural-bar doctrine. Murray cannot qualify for the cause-and-prejudice exception, and he does not argue that he can. Therefore, unless he qualifies for the actual-innocence exception, we are barred from reaching the merits of his claim. *Herrera v. Collins, supra,* —— U.S. at ——, 113 S.Ct. at 862.

██ In assessing whether to review Murray's claim on the merits, we must review the evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[,]" not whether "[we believe] that the evidence at [Murray's] trial established guilt beyond a reasonable doubt." *Id.* at ——, 113 S.Ct. at 861 (citations and internal quotations omitted). Thus, our job is not to determine whether the trier of fact made the correct determination of guilt or innocence, but to determine whether it could have made a rational decision to convict the petitioner if the new evidence Murray now cites had been before it. The petitioner bears the burden of showing by clear and convincing evidence, that but for the alleged constitutional violation no reasonable juror would have found him eligible for the death penalty under Missouri law. *Sawyer v. Whitley, supra,* —— U.S. at ——, 112 S.Ct. at 2517.

Murray's claim is that he is actually innocent of the crime and that he was convicted because the witnesses, Gladys Nutall and Gloria Hennings, perjured themselves. In support of his allegations, Murray points to what he describes as contradictions in the witnesses' testimony. He also offers an affidavit from his brother William, in which William claims that he committed the acts for which the jury convicted the petitioner; this affidavit conflicts with the testimony offered at trial by Nutall and Hennings. Finally, the petitioner offers several other affidavits filled with statements from people who claim to

---

**2.** We put to one side the question whether, as Murray argues, the presence of perjured testimony, in and of itself, without regard to the prosecution's knowledge of the perjury, is a due-process violation. Because we do not reach the merits of the perjured-testimony claim, it is unnecessary to discuss this issue.

have heard William Murray confess to the crimes before the date of petitioner's conviction.

We have reviewed Nutall's and Hennings's testimony and, although it was not always exact or perfectly clear, we conclude that a rational trier of fact could have believed these witnesses. Moreover, if William had told petitioner's jury that he, not Robert, killed the two victims, the jury might have believed him, but it would have been entirely rational not to.

Furthermore, we conclude that the after-the-fact affidavits offered by Murray are insufficient to sustain his claim that the witnesses committed perjury. Even if believed, the affidavits might show only that the women were mistaken, which is not the same thing as lying under oath. In addition, the facts in this case are similar to those in *Herrera v. Collins, supra.* In *Herrera,* the Supreme Court reviewed a denial of habeas corpus in a case in which a death-row petitioner argued on the basis of an affidavit that the affiant, and not the petitioner, was guilty of the crime. The Supreme Court held that the traditional remedy for a claim of actual innocence based on new evidence, which was discovered too late to file a new-trial motion, is not federal habeas relief, but executive clemency under state law. *Herrera v. Collins, supra,* —— U.S. at ——, 113 S.Ct. at 869. It also held that in a capital case, an extremely persuasive demonstration of actual innocence might warrant federal habeas corpus relief if no state avenue existed in which to process the claim. *Ibid.* However, before a court can consider such a claim, the petitioner must meet an "extraordinarily high" threshold. *Ibid.* The Supreme Court held that Herrera had failed to meet this threshold because he proffered affidavits, over eight years after his trial, which consisted mainly of hearsay and contained inconsistencies. *Ibid.*

Murray's affidavits suffer from many of the same afflictions as Herrera's. Even though the affidavit from William Murray contains a confession to the crime, it is highly suspect. William confessed to the crime only after his own conviction was final. The petitioner has not offered a sufficient explanation for why his brother is willing to come forth now and confess, rather than several years ago, during the trial in which the petitioner's life was at stake. Instead, William Murray has offered an affidavit several years after his own brother was sentenced to death, only after being convicted himself, and after safely receiving the lesser sentence of life in prison without parole. The other affidavits likewise are suspect because they are replete with hearsay and fail convincingly to answer the question: why now? Moreover, these affidavits contain significant inconsistencies. Petitioner has failed to bring himself within the actual-innocence exception to the procedural-bar defense.[3]

### C.

Murray also argues that his conviction and death sentence violate his constitutional rights because the prosecutor elicited testimony he should have known was false and made misleading statements to the jury based on the same testimony. This claim, in essence, comes down to the fact that two of the witnesses' statements at trial were inconsistent with earlier statements to the police. Given the inconsistencies, Murray says, the prosecutor must have known that the witnesses perjured themselves at trial; therefore, he committed misconduct by allowing them to testify and by relying on their testimony in his opening and closing arguments.

Again, the petitioner failed to raise this claim in his state post-conviction proceedings; therefore, we hold that this claim is procedurally barred. We have already held that Murray has failed to establish the cause-and-prejudice or actual-innocence excuses for not raising the issue of the perjured testimony in an earlier proceeding. In addition, the

---

**3.** Petitioner may be asserting actual innocence as a free-standing ground for habeas relief under *Herrera.* That case can be read to require that executive clemency be sought first, as a prerequisite to asserting actual innocence as a ground for habeas relief. It is not necessary for us to decide this issue in the present case, however, because, even if a petitioner is not required to seek executive clemency first, the claim of actual innocence would fail in the present case, for much the same reasons we have given in the text for upholding the procedural-bar defense.

prosecutorial-misconduct claim is derived from the perjured-testimony claim, which is itself barred. Finally, it often happens that witnesses contradict themselves in statements given from time to time. Such contradictions are material for cross-examination, and may cause the jury to disbelieve the witnesses. They do not, without more, establish perjury.

### D.

■■ The petitioner next argues that the death sentence violates his constitutional rights because it is disproportionate to his responsibility for the crime. Murray argues that he did not kill or attempt to kill anyone, nor was he a major participant with the requisite mental state to be eligible for the death penalty. He offers the above-mentioned affidavits as support for his version of the night when Jackson and Stewart were killed. The District Court held that the evidence in the record supported the death sentence. We agree, and, having already decided that the affidavits are legally insufficient, we base our agreement on the facts set out by the Missouri Supreme Court in its opinion.

Robert Murray, the petitioner, accompanied his brother and another person to the apartment of Jeffrey Jackson, one of the murder victims. When the petitioner entered the apartment, he was masked and holding a gun. While William Murray and the other participant searched the apartment, the petitioner held a gun on the four victims. The petitioner participated in the robbery, taking Claudia Hennings's purse and Jackson's wallet.

In addition, the petitioner watched while his brother raped Gladys Nutall in the kitchen. Petitioner sexually assaulted Hennings. He helped bind the two men, Jackson and Craig Stewart, and then took them into the kitchen and participated in beating them. In addition, the petitioner took a knife and stabbed the floor around Jackson and Stewart. When Hennings attempted to escape from the apartment, the petitioner caught her, threatened her, and ordered her back to

the floor. Then she managed to escape. When she did so, she heard gun shots, presumably those which killed Stewart and Jackson. Nutall testified that she saw the petitioner hold Stewart up and shoot him execution-style. Later, when the police arrived at the scene, they discovered both Jackson and Stewart dead on the kitchen floor, each one shot twice in the back. Nutall identified the petitioner in a lineup, and he admitted to being in the apartment and gave a statement which revealed facts about the incident he had not been told by the police.

We review this evidence to determine whether it was sufficient for the fact-finder to convict Murray of first-degree murder and sentence him to death. Petitioner's argument that he was a minor participant is wholly unpersuasive. The victims in this case were murdered in the course of a robbery, and the petitioner took an active role in the circumstances causing the deaths. He held the victims hostage at gunpoint for three hours. He sexually assaulted one of the women. He bound and gagged the two men and participated in stabbing the floor around the two men who were murdered. He prevented Hennings from escaping and threatened her with physical harm if she attempted another escape. And, perhaps most importantly, trial testimony indicated that he shot at least one of the men.[4]

The defendant next argues, on the basis of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), that he did not possess the requisite degree of mental culpability to be sentenced to death. We believe that his reliance on these cases is misplaced. *Enmund* and *Tison* are felony-murder cases which apply in situations in which the defendant was not the shooter. As stated above, the evidence at trial indicated that the petitioner actually committed at least one murder, and perhaps both.

■■ The petitioner also argues that the Missouri Supreme Court did not afford him

4. The evidence at trial indicated that all bullets recovered from the two bodies were fired from the same gun. Therefore, the jury could have inferred that petitioner shot both men.

due process in giving his case the proportionality review required by Missouri law, Mo. Rev.Stat. § 565.035.3 (1986). We disagree. Both defense and prosecution were aware that proportionality was an issue on direct appeal under Missouri law. Both sides were free to argue the issue in their briefs and at the oral argument. The Missouri Supreme Court addressed and decided the issue in its opinion. The question of proportionality involves a comparison with other cases, and the issue, to be sure, is not soluble in precisely quantifiable terms. It involves the exercise of discretion and judgment. That is true of many crucial issues in the law—deciding what a reasonably prudent person would do in certain circumstances, for example. We see no unfairness or deprivation of due process in the Missouri Supreme Court's procedures for exercising a proportionality review. The federal Constitution of its own force, of course, requires no such review. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

### E.

Petitioner's strongest argument is that six venirepersons, including two who actually served as jurors, were biased in favor of the death penalty. The District Court held that the record supported the Missouri Supreme Court's conclusion that the venirepersons could follow the trial court's instructions and consider both alternative punishments. We agree.

■ The defendant has a constitutional right to an impartial sentencing jury. *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). If a juror would automatically impose the death penalty on a convicted murderer, our Constitution prohibits that juror from participating in sentencing. *Ross v. Oklahoma,* 487 U.S. 81, 85, 108 S.Ct. 2273, 2276–77, 101 L.Ed.2d 80 (1988). The key issue is whether a juror's support for the death penalty would prevent him or her from abiding by the law and following the trial court's instructions. *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). We review the entire record, not individual responses, to determine whether a prospective juror was quali-

fied. See *State v. Smith,* 649 S.W.2d 417, 425–26 (Mo.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). When a state trial or appellate court has made a factual finding on a claim a petitioner raises on habeas corpus, we defer to that finding if it is fairly supported by the record. 28 U.S.C. § 2254(d); *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984); *Brown v. Lockhart,* 781 F.2d 654, 658 (8th Cir.1986) (citation omitted). Whether a juror is impartial is a question of fact for this purpose. *Patton v. Yount,* 467 U.S. at 1036, 104 S.Ct. at 2891.

The petitioner raised this issue in his appeal before the Missouri Supreme Court. After reviewing the voir dire for each of the jurors in question, that Court found that all of the challenged venirepersons had indicated that they were able to consider both alternative punishments, and, therefore, the petitioner's constitutional rights were not violated. *State v. Murray, supra,* 744 S.W.2d at 768–69. The Missouri Supreme Court specifically found that, although the challenged venirepersons did at some point equivocate about their ability to consider both death and life in prison without parole, all also stated they could consider both. On the basis of this finding, the Court held that the trial court did not abuse its discretion in refusing to strike the venirepersons. *Id.* at 769.

■ The question is whether these factual findings have fair support in the record of the trial. First, we consider the two venirepersons, Regina Williams and Rosetta Brown, who actually served on the petitioner's jury. Each was subjected to death-penalty questioning by both the prosecution and defense counsel.

When Williams was first questioned by the defense about her position on the death penalty, the following colloquy occurred:

> Defense: "Tell me what your position is on [the possibility that life without parole would be a severe enough punishment for premeditated murder]."
>
> Williams: "I believe that if you are convicted of first degree murder that you should get the death penalty."

Defense: "Okay. And life without parole would be—would not be a possible punishment in your consideration for premeditated, deliberate murder?"

Williams: "No."

T.Tr. 264. Later, the prosecuting attorney explained to the panel that, under the law, two punishments were to be considered, and stressed the importance of following the law. After he had done so, he asked the entire panel if they could "be open-minded jurors" and consider both punishments before making a capital-punishment "decision." Williams joined the panel in responding yes to his question. T. Tr. 275.

Later, after the trial court had considered and rejected defense counsel's motion to strike Williams as a juror, Williams responded to questions from the trial court:

The Court: "All right. And I am going to ask the second half of that question. Or would you, because you have found—if you find murder one, would you automatically assess the death penalty without regard to listening to the aggravating or mitigating circumstances?"

Williams: "I would consider both."

T.Tr. 302–03. She responded the same way when asked as part of the panel:

The Court: "All right. Now yesterday it was said several times, and I want you to look into your hearts and souls when I ask you this question.... Sometimes people ... [i]f I ask them some questions feel they are giving me an answer they think I want to hear. Okay. You all know what I mean by that? We don't want that. Look into your hearts and minds again. Will you consider, if we get that far, both penalties involved? Okay?"

Panel: "Yes."

The Court: "No matter what you said before, I mean, these lawyers are entitled to know, and this defendant is entitled to know. Will you consider both, if we get that far? Yes?"

Panel: "Yes."

The Court: "Anybody who would not? And we are not going to try to convince you otherwise. It's just a simple yes or no."

Panel: "Yes."

The Court: "I have everybody's word on that?"

Panel: "Yes."

T. Tr. 303–04.

Rosetta Brown's voir dire followed a similar pattern. When questioned by the prosecution, she indicated support for the death penalty, but indicated that she could consider both sentencing options. T. Tr. 234–35.

Later, in response to questions by defense counsel, she stated that she favored the death penalty and would impose it in a first-degree case. T. Tr. 259–60. Then, Brown responded to the trial court's panel questions in a manner identical to Williams. T. Tr. 303–04.

The Missouri Supreme Court specifically found, on the basis of the above questions and answers, that these jurors were capable of applying Missouri law and sentencing the defendant in accordance with the Constitution. After reviewing the transcripts ourselves, we hold that this finding has fair support in the record, and we therefore defer to it. Although both of these jurors stated at some point during voir dire that they could consider only the death penalty, both of them also stated that they could consider the full range of punishment. Then, after being reminded of the law by the trial court, both jurors affirmatively replied that they could apply the law and consider both punishments. They repeated this assurance to the trial court in response to several questions designed to confirm their ability to serve as unbiased jurors. We agree with the District Court with respect to these two jurors.

Murray also raises questions about four other venirepersons, Victoria Alsup, David Fischer, Carolyn Artega, and Elbert Witte. He argues that because the Court rejected his attempt to remove these jurors for cause, he had to use peremptory strikes to remove them. This use of his peremptory strikes, he argues, violated his right, under the then-applicable state statute, to have a full panel of qualified potential jurors before the use of peremptory challenges. Mo.Rev. Stat. § 546.180.3 (1986), repealed and re-

placed by Mo.Rev.Stat. § 494.480 (1989). In addition, according to Murray, because he was forced to remove these jurors with peremptory challenges, his constitutional right to due process was infringed.

Although the Supreme Court has not specifically decided this question, see *Ross v. Oklahoma, supra,* 487 U.S. 81, 108 S.Ct. 2273, the Missouri Supreme Court appears to have held that defendants had such a right under Missouri law as of the time Murray was tried. *State v. Wacaser,* 794 S.W.2d 190, 193 (Mo.1990). However, we need not reach this issue, because we hold that the District Court did not err in upholding the Missouri Supreme Court's finding that these four jurors were able to apply the law fully and to sentence Murray accordingly.

Beginning with venireperson Victoria Alsup, we review the voir dire portion of the transcript. Alsup's answers to defense and prosecution questions reveal an ability to consider both sentencing options. T. Tr. 232–34. Later, in response to questions from defense counsel, Alsup indicated that anyone who committed cold-blooded, premeditated murder should receive the death penalty. T. Tr. 262. The prosecutor then explained the law to Alsup, and she responded that she could wait until the completion of the evidence before making a decision, and that she would follow the law explained to her by the trial court. T. Tr. 272–73. Still later, defense counsel questioned Alsup again, and this time she indicated that although she thought death would be the appropriate punishment for someone who committed cold-blooded murder, she would consider all of the evidence and talk with her co-jurors before reaching such a conclusion. T. Tr. 282.

Taking Alsup's answers to prosecution and defense questioning as a whole, we cannot say that the Missouri Supreme Court's factual findings are incorrect. Alsup's answers seem inconsistent at first, but after having the law explained to her, she indicated that she would consider both sentencing options and would attempt to apply the law as explained to her by the trial court. This is all that Murray was entitled to under the law. *Wainwright v. Witt, supra,* 469 U.S. at 424–26, 105 S.Ct. at 852–53.

The questioning of Fischer proceeded in much the same manner. In response to questions from the prosecutor, Fischer indicated that he supported the death penalty, that applying it to a particular defendant was a "big decision[,]" and that he could apply the law in a specific case to determine the appropriate sentence. T. Tr. 243–44. Then, when questioned by defense counsel, he indicated that life without parole would be an insufficient sentence for a cold-blooded, premeditated killer. T. Tr. 258–59. Later, the prosecutor questioned the entire panel, explained the law about aggravating and mitigating circumstances, and asked them whether they could follow the law as explained. Fischer responded in the affirmative.

> Prosecutor: "Okay. Is there anyone here on this whole panel that would not do that, that would not wait until all the evidence is in before you made that determination as to whether or not to give life with no parole or the death penalty? Would you all wait, listen to the evidence, and follow the instructions of law when it talks about—you will read these instructions that they are going to give you, aggravating versus mitigating circumstances. That is what the legislature says you must find before you can even consider the death penalty. Will you all do that; be open-minded jurors and do that before you even get to that decision?"

> Panel: "Yes."

T. Tr. 275. Again, even though Fischer indicated support for the death penalty as a form of punishment, he also indicated that he could wait until the entire process was completed, before voting for or against a death sentence in this case.

Although venireperson Carolyn Artega's support for the death penalty was particularly strident, the pattern of the questions and answers was similar to that of the other panel members. After indicating to the prosecutor that she supported the death penalty, she indicated that she understood it was not an automatic sentence, and that she could consider all of the evidence before reaching a determination. T. Tr. 190–91.

Were it not for the clarifying questions from the trial court, we might have needed to proceed to the question of whether the use of a peremptory strike on Artega violated Murray's rights. However, after the Court explained the procedure of the trial and the law involved to Artega, she indicated that she too could consider the law and reserve judgement until the completion of the evidence. T. Tr. 204–206.

The transcript of venireperson Elbert Witte's responses to questions again reveals a similar pattern. Witte indicated his support for the death penalty, and after the prosecution objected to the form of a defense question, the trial court broke in to the questioning in an attempt to clarify the situation. After a lengthy explanation of the two-tiered trial and sentencing process, the Court explained to Witte about aggravating and mitigating circumstances. T. Tr. 373–74. Then, after confirming that Witte would follow the instructions, the trial court asked Witte if he could consider both life without parole and death. Witte answered yes. T. Tr. 374–75. Witte's responses are similar to those of the other venirepersons. His final statements indicate that he would not impose the death penalty automatically; instead, he would consider both sentencing options. T. Tr. 375–76.

On the basis of the entire voir-dire transcript, we affirm the District Court's holding with respect to each of the six jurors. In response to questions from the Court, the prosecution, and the defense, each of the questioned jurors or venirepersons indicated an ability to consider the available sentencing options, and to reserve their decisions until the completion of the process. The trial court's and Missouri Supreme Court's findings are fairly supported by the record.

### F.

Murray's next argument is that his trial counsel was ineffective because she did not conduct a reasonable investigation, obtain independent, competent psychological evaluations, or present diminished-responsibility and mitigating psychological evidence. Murray urges that, if his trial counsel had conducted a reasonable investigation, she would have discovered that he was dominated by his brother, William. Murray also contends that this evidence, as well as evidence about his dysfunctional family and abused childhood, would have reduced the degree of his offense or, at least, decreased the sentence the jury would have imposed. In addition, Murray argues that his trial counsel was ineffective because she did not object to the trial court's aggravating-circumstance instruction. The District Court found that all of these contentions, except the aggravating-circumstance argument, were procedurally barred.

Murray filed a motion for post-conviction relief under rule 29.15, in which he alleged ineffective assistance of trial counsel. The Circuit Court of St. Louis County reviewed his motion and denied it. The Missouri Supreme Court also reviewed and denied this motion. *Murray v. State, supra,* 775 S.W.2d 89. Although Murray now seeks to raise several issues of ineffectiveness, he did not raise, in state court, most of the issues he raises in the petition before us today. We must consider whether he is precluded from raising them now.

Once again, Murray can raise these new issues only if he can prove cause and prejudice or actual innocence. And, again, Murray does not contend that he is eligible for the first exception. However, in his response to the State's brief, he does argue that this Court should apply the actual-innocence exception to consider the merits of his ineffective-assistance claims. The District Court considered his claims on the merits, but, because we find them barred, we decline to follow suit.

The same standard applies at the penalty stage that we discussed in the context of the guilt phase: to procure a review on the merits of his defaulted claim, Murray must show by clear and convincing evidence that but for the alleged constitutional error, no reasonable juror could have found him guilty of the crime or eligible for the death sentence. *Sawyer v. Whitley, supra,* — U.S. at —, 112 S.Ct. at 2517; *McCoy v. Lockhart,* 969 F.2d 649, 651 (8th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 3056, 125 L.Ed.2d 739 (1993) (holding that the *Sawyer* clear-and-

convincing standard applies to both the guilt and penalty phases of a trial).

In reviewing the ineffective-assistance claim in the actual-innocence context, we consider, in addition to the evidence actually offered at trial, the evidence Murray alleges should have been included. Murray argues that if his trial counsel had explored an independent psychiatric evaluation with greater vigor, the evaluation would have shown that Murray was both under the domination of his brother and under the influence of drugs at the time of the crime. Murray urges that these factors would have prevented the jury from convicting him of first-degree murder. We disagree. The jury might have been persuaded by the additional psychological evidence, but it also could rationally have rejected it. It could have disbelieved the experts Murray now says trial counsel should have presented; or it could have believed them but nonetheless concluded, as a matter of its own moral judgment, that Murray should be held fully responsible.

### G.

Next, Murray argues that his death sentence violated his constitutional rights, because the jury was unconstitutionally instructed that a finding of mitigating circumstances had to be unanimous. The petitioner did not raise this claim in his state, post-conviction review, see *Murray v. State, supra,* 775 S.W.2d 89, but we need not pursue the permutations and combinations of the procedural-bar doctrine with respect to this claim. We have previously rejected it on the merits, *e.g., Battle v. Delo,* 19 F.3d 1547, 1562 (8th Cir.1994) (alternative holding). This panel is bound by that holding and it requires us to reject Murray's claim based on *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

### H.

Murray also argues that the jury instruction defined "reasonable doubt" in a manner which allowed the jury to convict him on a lesser standard than constitutionally required. The Due Process Clause of the Fourteenth Amendment protects an accused from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). Murray raised this claim before the Missouri Supreme Court and before the District Court; therefore, we consider it on the merits.

The challenged instruction read:

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

This instruction, Murray argues, would lead a reasonable juror to believe that a finding of guilt could rest on a degree of proof less than that required by the Due Process Clause. In support of this argument, Murray contends that the words "firmly convinced" equate the burden of proof in his criminal trial with the less stringent, clear-and-convincing standard required in some civil cases. Murray cites a Supreme Court decision, *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), which found a jury instruction to be unconstitutional, as support for his argument. In *Cage,* the Court held the following instruction constitutionally infirm:

If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial

basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reason of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*

*Id.* at 40, 111 S.Ct. at 329 (emphasis in original) (citations omitted). The Supreme Court found this instruction to be unconstitutional because it "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was [not] guilty." *Id.* at 41, 111 S.Ct. at 329. According to the Court, the words "substantial" and "grave" as they are commonly understood, suggest a higher degree of doubt than that required for acquittal under the reasonable-doubt standard. Thus, the Court held that an accused could have been convicted based upon a standard of proof below that required by the Due Process Clause. *Ibid.*

We hold that this claim is barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). In *Teague,* the Supreme Court held that as a threshold issue, a court must consider whether the claim urged by a habeas petitioner requests a remedy for which the court would have to craft a new rule. If a court finds that a new rule would be required, it may not proceed to determine the merits of that claim, with certain exceptions not here relevant. *Id.* at 300–01, 109 S.Ct. at 1069–70. The Court broadly defined the term "new rule," holding that a "case announces a new rule when it breaks new ground or imposes a new obligation on the States or Federal government[ ] ... [or] if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301, 109 S.Ct. at 1070 (emphasis in original). The effect of *Teague* is to limit severely the claims available on habeas.

Applying the *Teague* new-rule analysis to this case, we hold that we are prevented from considering the petitioner's claim because the relief he seeks would require us to create a new rule, the very action barred by *Teague.* Murray argues that the challenged jury instruction violated his constitutional rights because the trial court's instruction on "reasonable doubt" contained the term "firmly convinced." Murray attempts to analogize the instruction used at his trial to one found unconstitutional by the Supreme Court in *Cage.* The result for which Murray argues is not dictated by *Cage* or any other precedent. We first note that the term "firmly convinced" is not comparable to the phrases— grave uncertainty, actual substantial doubt, and moral certainty—criticized by the Court in *Cage.* Moreover, although the Supreme Court has not overruled *Cage,* a decision announced this term certainly weakened it. In *Victor v. Nebraska,* —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Supreme Court held that two instructions, one in a California case and one in a Nebraska case, using words somewhat similar to those found constitutionally problematic in *Cage,* were valid. Considering the reasonable-doubt instructions in their entirety, the Court held that both instructions were valid, even though they contained the terms "moral certainty," "actual and substantial doubt," and "moral evidence." Given the range of acceptable instructions as defined by the Supreme Court, we believe that we would have to break new ground to find that an instruction which charged the jury to be "firmly convinced" before convicting Murray was constitutionally infirm. Therefore, we hold that this claim is barred by *Teague.*

### I.

■ Next, Murray challenges the aggravating-circumstance instruction used in the penalty phase of his trial as unconstitutionally vague and overbroad. Although Murray did not raise this claim in his direct appeal, the Missouri Supreme Court addressed this issue in its independent review of the sentencing instructions, and found that the instruction, as applied in this case, passed muster. *State v. Murray, supra,* 744 S.W.2d at 775–76.

The evidence submitted at trial described two gruesome murders. Two victims were bound, gagged, and held hostage for three hours before being shot execution-style. Murray and his cohorts stabbed the floor around the victims and sexually assaulted the two victims who managed to escape. On the basis of this evidence, we believe the jury could have found that the victims were subject to serious physical and mental abuse, and that Murray's actions exhibited the disregard for human life found by the Missouri Supreme Court. *Ibid.* Moreover, this Court has previously found similar instructions to be valid. See *Battle v. Delo,* 19 F.3d 1547, 1562–63; *Mercer v. Armontrout,* 864 F.2d 1429, 1435 (8th Cir.1988).

## IV.

After carefully reviewing each of Murray's claims for federal habeas relief, we affirm the District Court's denial of his petition.