Calvert L. ANTWINE, Appellant,

v.

Paul DELO; Missouri Attorney General, Appellees.

No. 94–1890WM.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1994.

Decided May 12, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied July 25, 1995.

---

Jay D. DeHardt, Kansas City, MO, argued, for appellant.

Stacy L. Anderson, Jefferson City, MO, argued (Jeremiah W. (Jay) Nixon, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, Circuit Judge, and REAVLEY,* Senior Circuit Judge.

## RICHARD S. ARNOLD, Chief Judge.

Calvert Leon Antwine appeals the District Court's denial of his petition for a writ of habeas corpus. We affirm in most respects, but we conclude that Antwine was denied the effective assistance of counsel during the penalty phase of his trial and that the prosecutor's penalty-phase closing argument violated Antwine's Eighth and Fourteenth Amendment rights. We therefore vacate his death sentence and remand to the District Court with directions to issue a writ of habeas corpus releasing Antwine from the sentence of death, unless the State of Missouri commences proceedings to re-sentence him within a reasonable time. The capital-murder conviction itself is upheld in all respects.

### I.

On November 11, 1983, Calvert Antwine was trying to find Eric "George" Jones, one of his employers in a drug-dealing business. In the course of his search, Antwine robbed several workers who were refurbishing one of George's buildings and shot and killed Winston Jones, George's brother and business partner. When he finally encountered George, their struggle over a gun attracted police attention. The police arrested both men, handcuffed them, and placed them in a holding cell. Five or ten minutes later, an officer heard some yelling and looked into the holding cell to find George lying face down on the floor, bleeding from the nose and mouth, and Antwine sitting on a bench a few feet away. The officer checked on George, then stepped away to call for help; when he turned back, he saw Antwine in midair, coming down with both feet on George's head. George died from head injuries a few days later.

A jury convicted Antwine of capital murder, second-degree murder, and first-degree robbery. He was sentenced to death for the murder of Eric "George" Jones, to life imprisonment for the murder of Winston Jones, and to 30 years for the robbery.

Antwine appealed his convictions. While the case was pending, the Supreme Court of the United States decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). The Missouri Supreme Court remanded Antwine's case to the trial judge for a *Batson* hearing to determine if Antwine had established racial discrimination in the State's use of peremptory challenges during jury selection.

The trial judge determined that Antwine had not made a prima facie *Batson* case, and the Missouri Supreme Court affirmed Antwine's convictions and death sentence. *State v. Antwine*, 743 S.W.2d 51 (Mo.1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988). Antwine then filed a pro se motion for post-conviction relief under Missouri Supreme Court Rule 29.15. His appointed post-conviction counsel filed one timely and five untimely amended motions. After an evidentiary hearing on the claims raised in all the motions, the motion court denied relief. On appeal, the Missouri Supreme Court, deeming the grounds raised in the five untimely motions procedurally waived, affirmed the motion court's judg-

*The Hon. Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

ment. *Antwine v. State,* 791 S.W.2d 403 (Mo.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991).

The Missouri Supreme Court subsequently summarily dismissed the habeas petition that Antwine filed pursuant to Missouri Supreme Court Rule 91. Antwine then petitioned in federal court for a writ of habeas corpus under 28 U.S.C. § 2254. The District Court denied the writ, and Antwine appeals to this Court.

The petition raises a number of constitutional claims, most of which are either procedurally barred or without merit. But the petition does include two successful arguments: Antwine's counsel gave him ineffective assistance during the penalty phase of his trial in violation of the Sixth and Fourteenth Amendments, and the prosecutor's penalty-phase closing argument violated the Eighth and Fourteenth Amendments. We turn to these claims first.

## II.

Antwine argues that the prosecutor's penalty-phase closing argument violated his Eighth and Fourteenth Amendment rights. The District Court did not address this issue since it found that Antwine had procedurally defaulted all of his claims except for specific claims of ineffective assistance of counsel.

The District Court based its finding of procedural default on its conclusion that the Missouri Supreme Court had found "that the only claims not procedurally barred [were] those involving specific allegations of ineffective trial counsel." *Antwine v. Delo,* No. 91–0079–CV–W–1, slip op. at 4 (W.D.Mo. March 4, 1993). But as we read its opinion, the Missouri Supreme Court actually found that the only claims not barred were those raised in the defendant's timely motion for post-conviction relief. *Antwine,* 791 S.W.2d at 406. While that motion alleged several claims of ineffective assistance of counsel, it also included an allegation that the prosecutor's closing argument violated Antwine's Eighth and Fourteenth Amendment rights.

■ Even though Antwine raised this allegation in his timely post-conviction motion, it was still subject to a state procedural bar because he had not raised it in his direct appeal. The post-conviction motion court recognized this default and held that Antwine's failure to raise the issue on direct appeal barred any post-conviction relief. But the Missouri Supreme Court ignored the bar and addressed this federal claim on the merits. *Antwine,* 791 S.W.2d at 411. "State procedural bars are not immortal ...; they may expire because of later actions by state courts. If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise have been available." *Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991). We are therefore free to consider the merits of Antwine's claim.

Antwine's claim involves two parts. First, he argues that the prosecutor's closing argument diminished the jury's sense of responsibility for imposing the death sentence, in violation of the Eighth Amendment under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Second, he alleges that the prosecutor's argument was so inflammatory that it rendered the entire sentencing proceeding fundamentally unfair and denied him due process. We agree with both contentions.

## A.

■ During his closing argument in the penalty phase of Antwine's trial, the prosecuting attorney stated:

Let there be no question, we are asking you to put this defendant to death.... [H]e will be taken into a room. There will be witnesses that will come down. There will be a priest present. He will be asked if he has any last request.... He will be put in a chair. A pellet will be dropped into acid, and when he inhales that, he would be put to death instantaneously.

(Trial Tr. at 928–29.) The prosecutor's argument suggests that a condemned prisoner's death will be quick, painless, and humane: one quick breath, and the defendant will die at once. The reality, as we understand it, is or at least may be quite different. Eyewitness accounts of gas-chamber executions de-

scribe death throes lasting ten minutes or more; the inmate even remains conscious for the first few minutes after breathing the gas. Kevin Fagan, "Mason Dies as He Said He Would," *San Francisco Chronicle*, Aug. 25, 1993, at A1 (comparing the 14 minutes it took for David Mason to die to the 10 minutes it took for Robert Alton Harris, and noting that Mason was unconscious after the first three minutes); Kevin Leary, "Eyewitness to Execution," *Ottawa Citizen*, April 22, 1992, at A2 (noting that Harris appeared to lose consciousness one-and-one-half minutes after breathing the gas); John Hiscock, "Killer Dies After Night of Reprieves," *The Daily Telegraph*, April 22, 1992, at 1 (reporting that witnesses gave varying estimates of two to seven minutes for the time it took Robert Alton Harris to lose consciousness). Such a death is hardly "instantaneous."

Antwine's trial counsel did try to address the prosecutor's unfounded description by painting his own picture of the process, but he failed to challenge or even question the prosecutor's claim that Antwine would die as soon as he breathed the gas. He focused instead on the futile resistance leading up to the fatal breath:

> It's not going to be a simple procedure where he'll breathe and it's over with. It won't be that quick.
>
> He may try to hold his breath. No matter how hard he'll try to do that, it just won't work. He'll have to breathe. His body will have to try to get some oxygen, and then ... the gas will go into his lungs. As the oxygen moves into his bloodstream, then he'll die.

(Trial Tr. at 939–40.) Indeed, the defense counsel's description actually supports the prosecutor's suggestion that the prisoner will instantly die when he breathes the gas.

So where is the harm in this vision of a quick and easy death? The danger is that the jurors, faced with a very difficult and uncomfortable choice, will minimize the burden of sentencing someone to death by comforting themselves with the thought that the death would at least be instantaneous, and therefore painless and easy. The prosecutor's argument diminished the jurors' sense of responsibility for imposing the death penalty.

This diminution of the jury's sense of responsibility undermines the Eighth Amendment's heightened need for "the responsible and reliable exercise of sentencing discretion" in capital cases. *Caldwell*, 472 U.S. at 329, 105 S.Ct. at 2639. The assurance of a quick and easy death—like the assurance of appellate review that was denounced in *Caldwell*—"is no valid basis for a jury to return a sentence if otherwise it might not. It is simply a factor that in itself is wholly irrelevant to the determination of the appropriate sentence." *Id.* at 336, 105 S.Ct. at 2643.

We cannot say that the prosecutor's description of an "instantaneous" death had no effect on the sentencing decision. A decision based on such an argument does not meet the standard of reliability that the Eighth Amendment requires. On this basis alone, we hold that Antwine's sentence is constitutionally invalid.

## B.

■ Even if the prosecutor's description of the execution process had been accurate, there would still be a due-process question, because there was absolutely no evidence in the record to support what the prosecutor said. See, *e.g.*, *United States v. Bigeleisen*, 625 F.2d 203, 210 (8th Cir.1980) (finding due-process violation in combination of prosecutor's reference to facts not in the record and his failure to correct witness's false testimony). But the prosecutor went even further. In addition to his unsupported description of an "instantaneous" death, the prosecutor made the following comments to the jury in his closing argument:

> Why should you and I, as lawful, working citizens of this community, work the rest of our natural lives just so Calvert Antwine can live in the penitentiary for the rest of his natural life or at least until he's served 50 years in prison?

(Trial Tr. at 933.)

> [I]sn't it much more humane to sentence this man to death so that his brother can get on with his life, and so that the two children can get on with their lives, instead

of having to think, every day for the next 50 years, they have a brother or a father locked up in the penitentiary?

(Trial Tr. at 935–36.) Like the District Court, we agree with Chief Justice Blackmar that these comments have "no place in an American courtroom." *Antwine,* 743 S.W.2d at 74 (Blackmar, C.J., dissenting). The question we must answer is whether these comments, combined with the misleading and unsupported description of an "instantaneous" death, were prejudicial enough to render the entire sentencing proceeding fundamentally unfair and a violation of Antwine's right to due process.

■ This Court described the method for analyzing a potential due-process violation in a prosecutor's closing argument in *Newlon v. Armontrout,* 885 F.2d 1328, 1337 n. 10 (8th Cir.1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). When we find that a prosecutor has made improper comments during his closing argument, we must: (1) measure the type of prejudice that arose from the argument; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all of the aggravating and mitigating circumstances. *Id.*

Using this analysis, we found a due-process violation in *Newlon,* where the prosecutor had made a number of irrelevant and unsupported statements that could undermine both the jury's sense of responsibility for imposing the death penalty and its duty to base such a sentence on the defendant's individual circumstances and crime. In brief, the prosecutor in that case:

(1) expressed his personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record; (2) emphasized his position of authority as prosecuting attorney of St. Louis; (3) attempted to link petitioner with several well-known mass murderers; (4) appealed to the jurors' personal fears

and emotions; and (5) asked the jurors to "kill him now. Kill him now."
*Id.* at 1335.

The remarks in *Newlon* were "neither isolated nor ambiguous." *Id.* at 1338 (quoting *Newlon v. Armontrout,* 693 F.Supp. 799, 808 (W.D.Mo.1988)). The defense attorney made no effort to cure the improper argument, either through objection or response. The jury was instructed that the attorneys' closing arguments were not evidence, but that instruction was not sufficient to cure the error. *Id.* at 1337. After determining that there was a reasonable probability that the outcome of the penalty phase would have been different without the prosecutor's improper comments, we held that the comments prejudiced Newlon and violated his right to due process.

In *Blair v. Armontrout,* 916 F.2d 1310 (8th Cir.1990), *cert. denied,* 502 U.S. 825, 112 S.Ct. 89, 116 L.Ed.2d 62 (1991), by contrast, we found no due-process violation when the prosecutor made a single, brief comment, even though that comment was so improper and prejudicial that we had "no hesitation in condemning [it]." *Blair,* 916 F.2d at 1323. The prosecutor made the challenged statement "without pause or repetition" during a "tough, hard-hitting argument ... based on the hard facts presented." *Id.* at 1324. Accordingly, we determined that the one, isolated comment was "not sufficiently prejudicial ... to render Blair's sentencing hearing fundamentally unfair." *Id.* at 1325.

The prosecutor's closing argument in this case lies somewhere between the arguments made in *Blair* and *Newlon.* The challenged comments are more than *Blair*'s brief, isolated comment in the midst of a hard-hitting, fact-based argument, but they are somewhat less than *Newlon*'s "relentless, focused, uncorrected argument based on fear, premised on facts not in evidence, and calculated to remove reason and responsibility from the sentencing process." *Newlon,* 885 F.2d at 1338 (quoting *Newlon,* 693 F.Supp. at 808).

The closing argument here was improper and prejudicial. The comment we so strongly condemned in *Blair* is almost identical to the comment made by the prosecutor in this case about the taxpayers' burden for life

imprisonment.[1] As we said in *Blair*, "[t]here is simply no legal or ethical justification for imposing the death penalty on this basis and it is not a proper factor to be considered by the jury, for it does not reflect the properly considered circumstances of the crime or the character of the individual." *Id.* at 1323. That reasoning applies equally well to comments such as "death will be instantaneous" and "let the [defendant's] family get on with their lives."

As in *Newlon*, then, the prosecutor's closing argument contained a number of irrelevant and unsupported statements that could undermine the jury's sense of responsibility and its individualized consideration of the defendant. The comments were less numerous and thematic than those in *Newlon*, but they were not so isolated as the single comment in *Blair*. The prosecutor's argument, moreover, included a comment that we have already determined violates the Eighth Amendment, and, as we noted in *Newlon*, an Eighth Amendment analysis can bolster a finding of a due-process violation. *Newlon*, 885 F.2d at 1337.

Defense counsel effectively responded to the prosecutor's suggestion that it would be more humane to kill the defendant and let his family get on with their lives (Trial Tr. 936–37, 938–39). He failed, however, to object or respond to the improper, unsupported, and inaccurate [2] argument that a death sentence would be cheaper for the taxpayers than life imprisonment. He made no effort whatsoever to cure the prosecutor's attempt to lure the jury into choosing the death penalty for its economic efficiency rather than for its appropriateness to the defendant's crime. He also failed to object to the unsupported description of an "instantaneous" death, and

his ineffective response supported, rather than rebutted, the idea that the defendant would die instantaneously.

As in *Newlon*, the jury was instructed that the attorneys' closing arguments were not evidence. Once again, we conclude that such an instruction, standing alone, cannot shield prosecutorial misbehavior. If it did, even the most outrageously flagrant violations would be untouchable. *Newlon*, 885 F.2d at 1337.

Finally, we determine that there is a reasonable probability that, but for the prosecutor's misleading and uncorrected description of an "instantaneous" death and his improper and unsupported reference to the economic costs of life imprisonment, the outcome of this sentencing proceeding might have been different. There is no doubt that Antwine killed Eric "George" Jones in the police holding cell, but the two aggravating circumstances presented to the jury were balanced by some nonstatutory mitigating circumstances that could have led the jury to choose life imprisonment if the prosecutor had not fed their fears of economic burden while easing their conscience with the idea of a quick, humane death.

We conclude that the prosecutor's closing argument in the penalty phase of the trial violated Antwine's due-process rights under the Fourteenth Amendment, thus providing a separate basis for our holding that Antwine's sentence is constitutionally invalid.

## III.

Antwine also claims that his right to the effective assistance of counsel was violated when his trial counsel (1) failed to investigate fully and present mitigating evidence of Antwine's mental condition, and (2) failed to

---

1. The prosecutor in *Blair* argued:
   Why should we as taxpayers have to house this man for fifty years? Why should we have to feed him three meals a day for fifty years, clothe him for fifty years, furnish him recreation, medical care?
   *Blair*, 916 F.2d at 1322.

2. A recent study demonstrates that the cost of sentencing someone to death greatly exceeds the cost of sentencing him to life imprisonment. Philip J. Cook and Donna B. Slawson, *The Costs of Processing Murder Cases in North Carolina* 1 (Duke University 1993) (finding that the cost of

sentencing someone to death exceeds the cost of life imprisonment by $163,000, and noting that when the cost of cases that are adjudicated capitally but that do not result in execution are considered, the extra cost per death penalty imposed is $250,000; the extra cost per execution is $2 million). And, even if this study is itself questionable, the fact remains that there was no evidence before the jury on the costs of execution or life imprisonment, so it was a violation of due process for the State to refer to it in closing argument.

object to the prosecutor's inflammatory penalty-phase closing argument. Since the Missouri Supreme Court considered both of these claims on the merits (they were presented in the timely amended Rule 29.15 motion), we are not procedurally barred from considering them.

To grant relief based on a claim of ineffective assistance of counsel, we must find both that counsel's performance was constitutionally ineffective and that the ineffective performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 700, 104 S.Ct. 2052, 2071, 80 L.Ed.2d 674 (1984). To be constitutionally ineffective, counsel's performance must fall below an objective standard of reasonableness. *Id.* at 687–88, 104 S.Ct. at 2064–65. The defendant must overcome a strong presumption that counsel provided effective assistance, and we do not use hindsight to question counsel's performance. *Id.* at 689–90, 104 S.Ct. at 2065–66; *Kenley v. Armontrout,* 937 F.2d 1298, 1303 (8th Cir.), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991).

If counsel's performance was unconstitutionally ineffective, the question then becomes whether that ineffectiveness undermines our confidence in the outcome of the proceeding. When a defendant challenges a conviction, we ask whether there is a reasonable probability that the defendant would not have been found guilty if counsel's performance had not been ineffective. When a death sentence is challenged, the issue is whether there is a reasonable probability that, but for counsel's deficient performance, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068.

A.

■ Antwine argues first that his trial counsel was ineffective in failing to investigate fully and present evidence of his mental condition at the time of the murder, and that this ineffectiveness prejudiced his defense at both the guilt and penalty phases of his bifurcated trial.

Counsel did request and receive a court-ordered mental examination for Antwine within four months of the offense. The exam, though, consisted of only one 20–minute interview and a review of the police background sheet. From this, the state psychiatrist concluded that Antwine did not suffer from any mental disease or defect, and that his actions at the time of the offense were consistent with PCP intoxication.

Although the state psychiatrist had found that Antwine's behavior was consistent with PCP intoxication, trial counsel knew that Antwine denied using PCP at the time of the offense. He was also aware that there were indications in the police report that Antwine had been acting strangely a few days before the offense. Indeed, several witnesses that counsel interviewed claim that they tried to tell him about Antwine's odd behavior. But since counsel found Antwine to be articulate, lucid, and cooperative, he did not request an independent, second mental examination, even though Antwine had a right to such a second examination under state law.

A battery of examinations conducted several years after the offense at the request of post-conviction counsel produced evidence that Antwine suffers from bipolar disorder, a lifetime condition that usually arises in early adulthood. If, as seems likely, Antwine had the disorder at the time of the offense, counsel would probably have discovered it during a full investigation of Antwine's mental condition.

■ The Rule 29.15 motion court, however, found "no credible evidence to support the defendant's claim that he suffered from a mental disease or defect," *Antwine v. Delo,* No. CV88–14232, slip op. at 10–11 (Mo. Cir. Ct., Sept. 5, 1989), and the State argues that this state-court finding is entitled to a presumption of correctness under 28 U.S.C. § 2254. We disagree. The issue is whether the failure to discover and present evidence of Antwine's mental condition undermines our confidence in the outcome of either the guilt or sentencing phase of the trial. We are concerned, then, with whether the jury—not the motion court—would have found the evidence of Antwine's mental condition credible.

Of course, the motion court's finding of "no credible evidence" implies that if Antwine had presented the evidence at his trial, the jury, like the motion court, would not have believed it. But the reasons the motion court gave for not crediting the evidence of Antwine's mental condition do not support this inference.

First, the motion court suggested that the initial mental examination could not be unreliable or substandard merely because it was limited to a twenty-minute examination, when the second examiner, Dr. O'Connor, also gave Antwine a twenty-minute examination. But the first examiner based his conclusions on nothing more than that twenty-minute exam. Dr. O'Connor based his on the consistent results of two very different personality tests, the MMPI and the Rorschach, which he administered after a twenty-minute exam and a forty-minute history interview.

Second, the court dismissed Dr. O'Connor's findings because he did not request or perform any blood tests, even though such tests "are available to positively determine the existence of a Bi–Polar Disorder." *Antwine v. Delo*, No. CV88–14232, slip op. at 10 (Mo. Cir. Ct., Sept. 5, 1989). This conclusion is not supported by the record. Dr. O'Connor testified that there are three methods of determining the existence of a bipolar disorder: observation, blood tests, and personality tests (Hearing Tr. at 171–72). According to Dr. O'Connor's testimony—and there is no other evidence in the record on this issue—the "reliability of the blood test is almost as good as the reliability of the MMPI" (*id.* at 238). Thus, the record does not support the contention that the blood test "positively determines" the existence of the disorder. A blood test could certainly confirm the results of the MMPI and the Rorschach, but there is nothing in the record to indicate that such confirmation is necessary. Personality tests are an accepted and reliable diagnostic indicator of bipolar disorder in and of themselves.

The motion court also faulted Dr. O'Connor for failing to interview defendant's friends and family about his behavior and history. Again, such a step would have been additional evidence to confirm the personality test results, but there is nothing in the record to show the need for such confirmation.

Third, the motion court found that, while Dr. O'Connor stated that there was a reasonable probability that defendant suffered from bipolar disorder at the time of the offense, he could not state with certainty that defendant suffered from a manic episode on that day. The court found that the police officers' observations of Antwine's conduct were inconsistent with a manic episode. In fact, Dr. O'Connor testified that he thought it reasonably probable that Antwine was suffering from a manic episode at the time of the offense, and he pointed to the officers' observations as support for his opinion (*id.* at 261, 264–65).

Finally, the motion court found that Dr. O'Connor's diagnosis was not credible because it was based on an exam that occurred five years after the offense. Had counsel been effective, though, the examination would have been made shortly after the offense occurred. The question we must ask is whether a jury would have credited Dr. O'Connor's diagnosis if it had been presented to them at the trial, and whether the failure to present the evidence undermines our confidence in the proceeding. We believe that the jury might well have believed Dr. O'Connor's testimony if he had diagnosed Antwine's condition shortly after the offense.

Counsel stated at the 29.15 hearing that the only reason he could think of for getting a second mental examination—"at least as far as the guilt phase is concerned" (Hearing Tr. at 730)—would be to show diminished capacity in a bid for a jury verdict of second-degree murder. Since the defendant's goal was acquittal rather than a reduced sentence, counsel decided not to investigate or pursue a diminished-capacity defense. He gave no reason, though, for not requesting a second examination in preparation for the penalty phase of the capital murder trial.

At trial, counsel focused on a self-defense theory. Antwine testified that he wanted out of the drug business, but that the Jones brothers told him that would cause problems. According to Antwine, Winston threatened his family when he reiterated his desire to

leave the business. When Antwine told Winston to leave his family out of it, Winston picked up a pair of scissors and said, "You must be ready to die." Antwine drew a gun, shot out the television, and said, "I'm not playing." When Winston went for his own gun, Antwine shot and killed him.

A few hours later, Antwine was placed in a holding cell with George Jones after both men were arrested for struggling over a gun in the street. Antwine testified that George asked him what he had done to his brother. After Antwine replied that he had shot Winston, George swore that he would "get" Antwine, pointing out that he could post bond and get out of jail before Antwine could. Antwine testified that George then attacked him; after a brief fight, an officer found George on the floor, semi-conscious. Moments later, the officer saw Antwine stomp on George's head.

Antwine's testimony was the only direct evidence that trial counsel presented to support the theory of self-defense.[3] The jurors may have accepted the defense in part when they convicted Antwine of second-degree rather than capital murder for Winston's death. But when they convicted him of capital murder for George's death, they rejected the idea that Antwine had killed George—handcuffed, bleeding, and semi-conscious on the floor of the holding cell—in self-defense.

At the penalty phase, counsel relied on an emotional plea for mercy. The only witness presented by the defense was Antwine's brother, who asked the jury for mercy. At the 29.15 hearing, counsel explained that he had considered putting on elaborate evidence of mitigation, but had rejected the idea in favor of an emotional beg-for-mercy approach. He was concerned that the guilty verdict indicated that the jury had decided to give Antwine the death penalty, and felt that the best course would be an appeal to their compassion. Counsel also stated that he would have lost credibility if he had presented evidence of a mental impairment at the penalty phase, because such evidence would be inconsistent with the self-defense claim presented in the guilt phase.

The Missouri Supreme Court found that counsel's decision to reject an elaborate presentation of mitigating evidence in favor of an emotional appeal to mercy in the penalty phase was a reasonable trial strategy, as was his conclusion that a mental-impairment argument would be inconsistent with the trial claim of self-defense. *Antwine,* 791 S.W.2d at 407–08. The District Court agreed.

But "strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. The issue is whether it was reasonable to decide not to investigate Antwine's mental condition more fully. If it was, then counsel's subsequent decision to reject strategies based on Antwine's mental condition was also reasonable. But if limiting the investigation was not reasonable, then neither was the subsequent strategic choice. "[S]trategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." *Kenley,* 937 F.2d at 1304.

" 'Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake,' we believe that it was [counsel's] duty ... to collect as much information as possible about [the defendant] for use at the penalty phase of his state court trial." *Hill v. Lockhart,* 28 F.3d 832, 845 (8th Cir.1994) (citations omitted), *cert. denied,* — U.S. ——, 115 S.Ct. 778, 130 L.Ed.2d 673 (1995). Counsel's failure to request a second mental examination is more like inadequate trial preparation than a strategic choice. Counsel was aware that Antwine had been acting oddly before the offense; that a cursory mental examination conducted four months after the offense found that Antwine's behavior at the time of the offense was abnormal, but consistent with PCP intoxication; and that, while Antwine admitted to using PCP at other times, he denied using PCP at the time of the

---

The other five witnesses called by the defense testified to Antwine's residence and the Jones brothers' general reputation for violence.

offense. If Antwine's abnormal behavior was not due to PCP intoxication, what was its cause? Antwine's trial counsel should have followed through on this question. *Cf. O'Neal v. Delo,* 44 F.3d 655, 660 (8th Cir. 1995) (counsel was not ineffective for failing to pursue second mental examination after court denied request when there was no evidence that defendant exhibited any indicia of an abnormal mental state); *Sidebottom v. Delo,* 46 F.3d 744 (8th Cir.1995) (counsel not ineffective for relying on results of first mental exam when neither defendant nor his family could provide any information to contradict the examiner's findings).

Did counsel's omission prejudice the defense? If counsel had fully investigated Antwine's mental condition, it seems likely that he would have discovered evidence that Antwine suffered from bipolar disorder. If counsel had then presented evidence that Antwine was in the throes of a manic episode during the offense, the jury might have found that he did not have the specific intent—cool deliberation—required for capital murder. Perhaps such evidence would have even bolstered (rather than contradicted) Antwine's claim of self-defense by explaining why his reaction to George's threat was so extreme. The jury might have found reasonable doubt in the absence of counsel's ineffectiveness— but it might not have. We are not so uncertain about the fundamental fairness of the guilt phase that our confidence in the outcome is shaken. Even if the jury believed that Antwine was manic during the murder, they still could have found that his calm demeanor immediately before and immediately after the killing indicated cool deliberation. Moreover, Antwine himself insisted on presenting only the kind of defense that would have produced an acquittal. He rejected any theory that would have led merely to a conviction of a lesser offense. We cannot say that there is a reasonable probability that the jury's verdict would have been different if counsel had made a complete investigation. Indeed, in the face of Antwine's own firm decision against a less-than-complete defense, we cannot say that it was unreasonable of counsel not to make a diminished-capacity argument in the guilt phase.

We do hold, though, that there is a reasonable chance that Antwine would not have been sentenced to death if counsel had effectively presented evidence of Antwine's mental impairment at the penalty phase. Under Missouri law at the time of the offense, Antwine would have automatically received a life sentence if only one juror had refused to vote for the death penalty. 1978 R.S.Mo. §§ 565.006, 565.008 (repealed October 1, 1984). An effective presentation of Antwine's mental condition would have required the submission of additional statutory mitigating instructions. Since the jury found only two aggravating circumstances, the balance of aggravating and mitigating circumstances in the penalty phase of the trial would have been altered enough to create a reasonable probability that the jury would not sentence Antwine to death. See *Hill,* 28 F.3d at 846 (finding reasonable probability that jury would not have given death penalty if counsel had discovered and presented mitigating circumstances of defendant's mental disorder). We therefore hold that Antwine's sentence is constitutionally invalid under the Sixth and Fourteenth Amendments.

### B.

Antwine's second claim of ineffective assistance of counsel rests on his trial counsel's failure to object to the prosecutor's inflammatory closing argument during the penalty phase of the trial. The only practical effect of counsel's failure to object would be that the issue was not preserved for appeal, and, as we have shown, the Missouri Supreme Court reached the merits on the issue of the closing argument's constitutionality. Whether or not it was ineffective to fail to object to the argument is therefore irrelevant.

### IV.

The remainder of Antwine's arguments are either procedurally barred or without merit. We address each in turn.

### A.

Antwine contends first that his constitutional right to an impartial jury was violated when four venirepersons were improperly ex-

cluded for cause. The Missouri Supreme Court held that the trial judge did not abuse his discretion by excluding the challenged jurors, and we agree with the District Court that the record supports that holding.

The impartiality of a potential juror is a question of fact, and we defer to a state-court finding of juror bias if it is fairly supported by the record. 28 U.S.C. § 2254(d); *Murray v. Delo*, 34 F.3d 1367, 1377 (8th Cir.1994). We review the entire record to determine whether a prospective juror was qualified. *Murray*, 34 F.3d at 1377; see *State v. Smith*, 649 S.W.2d 417, 425–26 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). If the juror's views on the death penalty would "prevent or substantially impair the performance of his duties as a juror," *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), then he was properly excluded.

Each of the challenged venirepersons expressed doubt as to whether he or she would be able to consider imposing the death penalty. The Missouri Supreme Court found that two of the venirepersons, Briggs and Garrett, "initially expressed unequivocal opposition to imposing the death penalty in the case before them." *Antwine*, 743 S.W.2d at 61. Venireperson Garrett's initial opposition wavered when defense counsel asked if he could consider the death penalty against someone like Adolf Hitler; Venireperson Briggs hesitated when defense counsel asked her whether she could consider imposing the death penalty if a small child had been brutally murdered. *Id.* The Court concluded that their willingness to consider the death penalty in extreme hypothetical situations did not "render[ ] either of them immune from exclusion from the jury for cause." *Id.* We agree.

The other challenged jurors, Venirepersons May and Reyes,[4] were more ambiguous about their ability to render an impartial verdict. Ms. Reyes, for example, expressed her position as follows:

MR. DAKOPOLOS: Ms. Reyes, you indicated in the courtroom that you had some difficulty with the death penalty; is that correct?

VENIREPERSON REYES: Yes.

MR. DAKOPOLOS: And that is a religious, moral, or—belief or—

VENIREPERSON REYES: Yes. I think it's against my religion.

MR. DAKOPOLOS: What religion is that?

VENIREPERSON REYES: Catholic.

MR. DAKOPOLOS: Catholic religion. And because of the Catholic religion, would you find it impossible to vote the penalty of death under any circumstances, [ ]regardless of what the circumstances in this case might prove?

VENIREPERSON REYES: It would be a little bit difficult.

MR. DAKOPOLOS: Well, when you say a little bit difficult, that's kind of hard for us to gauge.... [W]ould your attitude toward the death penalty prevent you from making a fair and impartial decision as to the defendant's guilt?

VENIREPERSON REYES: Yes, I believe so.

MR. DAKOPOLOS: And when you say you believe so, are you certain of that?

VENIREPERSON REYES: Yes.

(Trial Tr. at 88–89.) Ms. May expressed a similar opposition. Even from the cold record, the trial court's decision to excuse these venirepersons for cause is fairly supported. If the answers were somewhat ambiguous, the court was entitled to resolve the ambiguity in the State's favor, particularly given the court's superior position for assessing the potential jurors' demeanor and credibility. *Wainwright*, 469 U.S. at 434, 105 S.Ct. at 857.

While Antwine does not dispute the prospective jurors' expressions of doubt about their ability to consider imposing the death penalty, he points out that those doubts were expressed only after the prose-

---

4. The State contends that Antwine's claim regarding the exclusion of Ms. Reyes is barred because he did not raise it on direct appeal. We have reviewed the briefs submitted to the Missouri Supreme Court on direct appeal and find that Antwine complained of the exclusion of Ms. Reyes as well as that of Ms. Briggs, Mr. Garrett, and Ms. May. Thus, no bar exists.

cutor gave an opening statement at voir dire that detailed the particular circumstances of his crime. Antwine argues that when the venirepersons were then asked about their ability to consider the death penalty, their answers reflected their opinion as to whether death could be an appropriate sentence in *this* case: those who answered "no" might have been willing to consider the death penalty for certain crimes, but from what they had heard, this was not such a case. Similarly, those who answered "yes" were not just willing to consider sentencing someone to death, they were willing to consider doing so on these facts.

We are not convinced that the prosecutor's detailed opening statement at voir dire was improper or that it rendered these venirepersons immune from exclusion for cause. "If [a juror] knows enough about the case to know that she could not consider imposition of the death penalty regardless of what evidence might be presented, she must be excused." *Williams v. Maggio,* 679 F.2d 381, 386 (5th Cir.1982) (affirming exclusion of potential juror who could not consider the death penalty for a murder committed during a robbery), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983). The challenged venirepersons all stated that they would not be able to consider imposing the death penalty—a considerable impairment to their ability to perform a juror's duties in a capital-murder trial. Because the record fairly supports the state court's finding of juror bias, we deny Antwine's claim.

### B.

Antwine argues next that his conviction is unconstitutional because the prosecutor violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), by using his peremptory strikes to eliminate African–Americans from the jury. We disagree.

While this case was on direct appeal, the Missouri Supreme Court remanded it for a *Batson* hearing. On remand, the trial court held that Antwine had failed to make a prima facie showing of racial discrimination under *Batson.* Antwine appealed, and the Missouri

Supreme Court affirmed. *Antwine,* 743 S.W.2d at 63–67.

We have cited the Missouri Supreme Court's careful analysis in *Antwine* several times. *Elem v. Purkett,* 25 F.3d 679, 682–83 (8th Cir.1994); *Jones v. Jones,* 938 F.2d 838, 844 (8th Cir.1991). We particularly approved of the Court's framework for determining whether a prosecutor's neutral, nondiscriminatory reasons for striking African–American jurors were sufficient to rebut a prima facie case of discrimination. *Elem,* 25 F.3d at 683. The Missouri Supreme Court applied that analysis in this case to find that the prosecutor's racially neutral reasons for striking African–American jurors were indeed sufficient and not pretextual. *Antwine,* 743 S.W.2d at 67. Even if Antwine can, as he asserts, make a prima facie case of discrimination under *Swain* by showing the prosecutor's history of racial discrimination, that showing could be rebutted by the prosecutor's nondiscriminatory reasons for striking the African–American jurors in this case. *Horton v. Zant,* 941 F.2d 1449, 1459 (11th Cir.1991), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992). Those reasons are sufficient to defeat a claim of racial discrimination under either *Swain* or *Batson;* we therefore deny Antwine's claim.

### C.

Antwine also challenges his conviction on the ground that the jury instructions defined "reasonable doubt" as "proof which leaves you firmly convinced." This definition, Antwine contends, allowed the jury to convict him on a lesser standard than constitutionally required. We need not proceed to the merits of this claim because we have previously held that it is barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Murray,* 34 F.3d at 1382.

### D.

Finally, Antwine raises three arguments regarding the jury instructions given during the penalty phase of his trial. He asserts that his death sentence is unconstitutional because (1) the jury was instructed that a

finding of mitigating circumstances had to be unanimous, in violation of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); (2) the mitigating-circumstance instruction improperly limited the mitigating circumstances that the jury could consider; and (3) the instruction that an aggravating circumstance existed if the murder involved "torture or depravity of mind" was unconstitutionally vague. Each of these claims is both procedurally barred and without merit.

■■■ Antwine defaulted these claims by failing to raise them in his motion for a new trial or his direct appeal. *Antwine,* 791 S.W.2d at 406. We need not determine if he can overcome this procedural bar since the claims all fail on the merits. This Circuit has previously considered and rejected all three claims. *Battle v. Delo,* 19 F.3d 1547, 1558–62 (8th Cir.1994) (rejecting same claims based on identical instructions); *Murray,* 34 F.3d at 1381, 1382 (rejecting *Mills* claim and aggravating-circumstance claim); *Mathenia v. Delo,* 975 F.2d 444, 449–50 (8th Cir.1992) (rejecting aggravating-circumstance claim where, as here, Missouri Supreme Court found that evidence supported finding of torture or depravity of mind), *cert. denied,* —— U.S. ——, 113 S.Ct. 1609, 123 L.Ed.2d 170 (1993). We are bound by our prior holdings to reject all three claims on the merits.

### V.

In conclusion, we hold that Antwine's conviction is valid, but that his death sentence violates the Sixth, Eighth, and Fourteenth Amendments because he received ineffective assistance of counsel during the penalty phase of his trial and because the prosecutor's penalty-phase closing argument was improper. We vacate his death sentence and remand to the District Court with directions to issue a writ of habeas corpus releasing Antwine from the sentence of death, unless the State of Missouri commences proceedings to resentence him within a reasonable time.

It is so ordered.