# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2047

_____

| | | |
|---|---|---|
| Jerry Dean King, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Mike Kemna, Superintendent; | * | |
| Jeremiah (Jay) Nixon, Attorney, | * | |
| General, State of Missouri, | | |
| | * | |
| Appellees. | * | |

_____

Submitted:  May 9, 2000

Filed:  September 22, 2000

_____

Before RICHARD S. ARNOLD, HEANEY and LOKEN, Circuit Judges.

_____

HEANEY, Circuit Judge.

Jerry King appeals the district court's denial of his 28 U.S.C. § 2254 petition for habeas corpus.  We reverse.

# I. BACKGROUND

In November 1993, King was living in a trailer behind his brother Dennis's home. At 4:00 a.m. on November 30, King came to his brother's door, where Dennis's wife Viola let him in. King told Dennis that he wanted to rob a bank, produced a .22 caliber pistol, and asked Dennis to load it. Dennis did so and gave the gun back to King, who put it in his pocket.

After jumping around the room in an attempt to prepare for the impending robbery, King asked his brother for a hug as it would be the last time they saw each other. After one hug, King asked for another. During this second hug, King pulled out the gun and shot Dennis under the arm. King ordered Dennis and Viola onto the floor. Dennis then wrestled with King, allowing Viola to escape the house. The brothers' scuffle led outside, where Dennis was able to seize the gun and throw it in the front yard.

King returned to the house while Dennis ran and hid in a gully. Dennis heard King run down the road, stop near him, then return to the house. Dennis and Viola then heard a second gunshot, saw King run to the house of a neighbor, Kenneth Ruark, and begin to pound on the door. When Ruark opened the door, he saw King with a gunshot wound in his leg. King told Ruark that Dennis had shot him. Ruark let King inside, and called for help. Five minutes later, Dennis knocked on Ruark's door, and told him King had shot him. Dennis repeatedly asked King why he shot him, but King did not reply. King accused Dennis of shooting him in the leg.

Prior to trial, King's first lawyer, Victor Head, moved for a mental evaluation of his client. The motion was granted, and King was examined by Dr. Harold Robb, senior psychiatrist at the Southwest Missouri Mental Health Center. Robb's subsequent report noted that King had previously suffered a gunshot wound to the head:

[King] reports that he was shot in the head by his cousin 5 or 7 years ago and was in a hospital in Tulsa for 2 weeks at that time. He points to a small, soft spot on the left side of the back of his skull where he said the bullet went three inches into his brain. He does not feel that he suffered any ill effects from this injury, apart from, 'I'm doing something, forget sometimes what I'm doing.'

(R. at 130.)

He has had seizures from time to time since then. He reports that he knows when they are coming on and that he may be unconscious for 2 or 3 seconds. The aura or warning signs include shortness of breath and a little spot of light that appears to go from one side to the other. The defendant states that when he is driving and has this feeling, he places his ignition keys on the floor of the car. He also states that he takes Dilantin 100 mg. QID to prevent these seizures.

(R. at 127.) Despite this information, Robb neither reviewed King's medical records, nor performed a physical examination, instead basing his report solely upon an interview with King, the court's order directing the examination, the complaint against King, and the police report regarding the November 1993 incident.

Robb's report also indicated that King had explained his brother's shooting as an accident:

[King] says that at time of the alleged offense, he was in the trailer and his brother came, 'Waking me up . . . come up to house for a cup of coffee.' The defendant went to his brother's home and 'his wife got to talking of bank robbery, doing something crazy.' The defendant thought that his brother was joking. The brother then went to the bedroom and came out . . . with a pistol in his hand and was pointing it at the defendant. The defendant then says that he fought with his brother 'over pointed gun, gun went off.'

(R. at 128.)

Robb concluded that King was competent to stand trial, and that King did not suffer--at the time of his examination or at the time of the shooting--from a mental illness or defect:

> The defendant does not suffer from a mental disease or defect that would cause him to lack capacity to understand the proceedings against him or to assist in his own defense . . . . It is my opinion, on the basis of the present examination and background information, that at the time of the alleged criminal conduct, the defendant did not suffer from a mental disease or defect that would cause him not to know or appreciate the nature, quality or wrongfulness of his conduct or make him incapable of conforming his conduct to the requirements of the law.

(R. at 126.)

Following Robb's evaluation, Head was replaced as King's attorney by Frank Yankoviz. At trial, King advanced something of a self-defense theory. In disjointed testimony, he contended that Dennis had been trying to get him to help buy and sell children, and that an argument had erupted because King did not want to be involved.[1]

---

[1]Typical of King's testimony is the following passage, in which King explains his conversation with Dennis the morning of the shooting:

> Anyway, Dennis is--Dennis and I were getting along okay. But he--he was--he was wanting me to do things for him that I particularly really didn't want to do, but I was kind of in a bind so did them anyway. He-- He wasn't really trying to manipulate me. You know, not really trying to, but he was doing it--I guess would it be a loving way or in a caring way. He wanted me to help him do things. And I really, you know--I told him, I said, 'Dennis, I really don't want to do this.'

-4-

According to King, Dennis retrieved a pistol from another room. King testified that he tried to grab the gun, but as he and Dennis wrestled, the gun discharged. King claimed not to have known that Dennis had been shot. King further stated that Dennis followed him outside with a rifle, and that he had been shot in the leg while wrestling Dennis for the rifle.

In 1994, King was convicted of first-degree assault and armed criminal action and sentenced to the maximum penalty, two consecutive terms of life imprisonment. After pronouncing sentence, the trial court inquired into King's satisfaction with his representation. Although stating he was satisfied with his attorneys' performance, he indicated that he was unable to remember that he had been represented by Head prior to Yankoviz's involvement in the case; whether counsel had done anything that King had asked him not to do; the name of the investigator who assisted with the case; and whether or not he had anything to add to his responses so far regarding counsel's effectiveness. The court found no probable cause that King had received ineffective assistance of counsel.

In June 1995, King--represented by yet another attorney, A. Renae Adamson--filed a Missouri Supreme Court Rule 29.15 motion to vacate, set aside, or correct his sentence and judgment. As relevant to this appeal, King contended trial counsel was

---

But he would do this by--Like I was--I needed gas money and to--to travel, to go about and by working at this place where we were working at. We were cleaning up these--this--where these barns had blown down. And by doing this, why we was getting money by--from the tin when we took it to the auction to sell it. Well it didn't give us very much, but it gave us some.

Dennis, he didn't--he had a store that he was operating, him and his wife. So, they had some type of income; and she wanted him to stop, to quit.

(Respondent's Ex. A at 232-33.)

ineffective for failing, despite knowledge of King's gunshot wound, to further investigate King's mental health. At an evidentiary hearing on the motion, King presented the testimony of neuropsychologist Dr. Dennis Cowan and psychiatrist Dr. William Logan, as well as their written evaluations of King's mental condition. Cowan and Logan believed that Robb's initial evaluation had been inadequate, and that King in fact suffered from serious mental disabilities. Cowan noted that King exhibited neuropsychological dysfunctions localized in the frontal lobe of his brain, and

> manifest[ed] very marked dysfunction in the areas of abstract reasoning abilities, higher level executive functioning, decision making capacities, planning, sequential reasoning abilities, development of insight and the implementation of that insight into his behaviors, memory functioning, attention/concentration, speed of mentation and bilateral motor dysfunction.

(R. at 122.) Cowan attributed these deficits to King's gunshot wound to the head, other instances of head injuries,[2] and King's history of substance abuse.

As a result of King's memory impairment, Cowan believed that King had a tendency to confabulate, essentially filling the gaps in his memory by "mak[ing] up what [he] think[s he] missed in order to complete the picture, what [he] think[s] the picture is . . . Any parts that are missing in his memory he's going to make something up to put in there to finish the story." (Respondent's Ex. B at 45.) This effort to compensate for his memory deficit, Cowan opined, would render King's testimony incredible.

Logan noted King's gunshot wound resulted in

---

[2]Prior to the November 1993 shooting King had on a number of occasions fallen and hit his head as a result of a grand mal seizure that caused him to pass out. King also suffered head trauma after being assaulted by inmates in March 1995.

extensive memory loss in a number of different areas including his ability to understand information that was either presented verbally to him or information that he read. It also affected his ability to retain that information . . . [H]e had difficulty using the information he did possess to make reason[ed] judgments.

(Id. at 86.) Logan also testified that in addition to cognitive difficulties, the bullet wound caused King to develop posttraumatic stress disorder: "[H]e would have frequent nightmares of being shot, would be irritable, angry. Nurses described him as unmanageable . . . [H]e would wake up in the middle of the night and run screaming down the hall, yelling "Kill or be killed. Kill or be killed." (Id.)

Logan echoed Cowan's comments regarding King's tendency to confabulate in order to compensate for his memory deficit, and opined that as a result of head trauma, King suffered from dementia characterized by memory problems and language difficulties. Logan also criticized Robb's evaluation as inadequate because Robb was aware of King's head injury but did not obtain neuropsychological testing, request medical records, or inquire about any cognitive or emotional difficulties King developed as a result of sustaining the gunshot wound. Logan concluded that at the time of November 1993 incident, King lacked the ability to understand the nature or quality and wrongfulness of his actions or control his actions within the requirements of the law. In Logan's opinion, this was the result primarily of posttraumatic stress disorder, and to a lesser extent, King's dementia and marijuana use.

Yankoviz testified he decided not to seek medical records or additional mental evaluations because King had been "adamant about not pursuing the legal defense of not guilty by reason of mental disease or defect." (Respondent's Ex. D at 178-79.) King wanted to avoid such a defense "because he didn't want to end up in a psychiatric institution." (Id. at 176.) Counsel acknowledged that King had told him he had been shot in the head and had asked Yankoviz to obtain his medical records. Explaining his failure to do so, Yankoviz testified:

> I told [King] we could do that but it was my opinion that, if we obtained those records, we would have to obtain those to use as for a mental disease or defect defense . . . but he did ask me at one time to obtain them.

(Id. at 177-78.) On two subsequent occasions, King again asked Yankoviz about obtaining his medical records and the testimony of a doctor who had treated him in the past. Again, Yankoviz replied that "since we weren't pursuing a legal defense of not guilty by reason of mental disease or defect . . . I didn't think that that would be admissible." (Id. at 178.)

In a May 1996 ruling, the motion court rejected King's challenge to the effectiveness of his representation, finding that King

> was competent to stand trial and competent to aid in his defense at trial and . . . did not suffer from mental disease or defect excluding criminal responsibility. In addition, the court finds that the defendant/movant made a rational decision not to pursue the defense of mental disease or defect excluding responsibility; and that movant had engaged in substance abuse. In addition, the court finds movant's version of events (self-defense) to be unbelievable and indicative of consciousness of guilt on movant's part.

(Id. at 41-42.)

The Missouri Court of Appeals affirmed, noting the motion court's superior position for judging the credibility of witnesses. The court concluded that the motion court "obviously disbelieved the testimony of Drs. Cowan and Logan[, and] . . . believed trial counsel's testimony that Defendant made a rational decision not to pursue the mental defect or disease defense." State v. King, No. 19751, slip op. at 9 (Mo. Ct. App. Mar. 24, 1997) (unpublished) (citation omitted).

-8-

King unsuccessfully petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2254. In its opinion denying the petition, the court quoted at length the decision of the Missouri Court of Appeals and concluded that the state court's resolution of King's ineffective assistance claim "did not result in a 'decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" King v. Kemna, No. 97-1578-CV-W-1-P, slip op. at 6 (W.D. Mo. Feb. 25, 1999) (quoting 28 U.S.C. § 2254(d)(1) and (2).) We granted King's application for a certificate of appealability with respect to whether trial counsel was ineffective in failing to investigate fully King's mental condition.

## II. DISCUSSION

As the district court recognized, § 2254(d) forbids the grant of habeas relief unless the state-court adjudication of a federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." "A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." Ramdass v. Angelone, 120 S.Ct. 2113, 2119-20 (2000). To the extent that inferior federal courts--including this court--have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue. See Atley v. Ault, 191 F.3d 865, 871 (8th Cir. 1999). We review the district court's legal conclusions de novo. See Preston v. Delo, 100 F.3d 596, 603 (8th Cir. 1996).

To prevail on his ineffective assistance claim, King must show that counsel's performance was deficient and that he was prejudiced by that deficient performance. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance

means representation that falls "outside the wide range of professionally competent assistance." Id. at 690. "Reasonable trial strategy does not constitute ineffective assistance of counsel simply because it is not successful." James v. Iowa, 100 F.3d 586, 590 (8th Cir. 1996).

However, "counsel must exercise reasonable diligence to produce exculpatory evidence[,] and strategy resulting from lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel." Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir. 1991). Although counsel is not obliged to seek a second opinion merely because the first was unfavorable, see Dees v. Caspiri, 904 F.2d 452, 454 (8th Cir. 1990) (per curiam), "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." Strickland, 466 U.S. at 690-91; see also Antwine v. Delo, 54 F.3d 1357, 1367 (8th Cir. 1995).

Initially, we decline to hold that counsel was ineffective for failing to seek a second evaluation of his client for the purpose of challenging Robb's opinion that King was competent to stand trial. King made clear to Yankoviz that he did not wish to be placed in a psychiatric institution, and the consequence of being adjudicated incompetent to stand trial is commitment to the state's department of mental health. See Mo. Ann. Stat. § 552.020 (West Supp. 2000). We cannot say that counsel was obliged to disregard both Robb's report and his client's wishes and further pursue a determination that his client was not competent to proceed. See LaRette v. Delo, 44 F.3d 681, 685-86 (8th Cir. 1995) (concluding counsel's decision not to pursue competency defense was reasonable where defendant insisted he was competent at time of offense and instructed counsel not to pursue such a defense).

Counsel's failure to pursue a second evaluation in preparation for a defense consistent with his client's expressed wishes is another matter. Under Missouri law, evidence that a defendant suffered from a mental disease or defect is admissible "[t]o

-10-

prove that the defendant did or did not have a state of mind which is an element of the offense." Mo. Ann. Stat. § 552.015(2)(8) (West Supp. 2000). The introduction of such evidence is the basis for a diminished capacity defense (also known as partial responsibility). A defendant who introduces evidence of a mental disease or defect may thus avoid conviction of a more serious crime in favor of conviction of a lesser offense, yet avoids the commitment to a state mental hospital mandated for those acquitted by reason of mental disease or defect, see Mo. Ann. Stat. § 552.040(2) (West 1987).

Counsel's decision to forgo a second investigation into King's mental condition effectively foreclosed a diminished-capacity defense. This decision was based not upon reasonable professional judgment, but upon an erroneous view of the relevance of such information.

In Missouri, first-degree assault requires proof that the defendant "attempt[ed] to kill or knowingly cause[d] or attempt[ed] to cause serious physical injury to another person." Mo. Ann. Stat. § 565.050(1) (West 1999). If trial counsel had developed and presented evidence that King, as a result of mental disease or defect, was unable to form the mens rea element of first-degree assault, King would have been entitled to an instruction on a lesser offense, most likely second-degree assault under Mo. Ann. Stat. § 565.060(1)(3) (West 1999) (defining second-degree assault as "[r]ecklessly causing serious physical injury to another person"). See State v. Anderson, 515 S.W.2d 534, 540-42 (Mo. 1974) (en banc) (holding defendant who was charged with first-degree murder and who presented evidence of mental disease or defect was entitled to instruction on manslaughter).[3]

_____

[3]It is at least arguable that a diminished-capacity defense is logically inconsistent with the self-defense strategy counsel pursued at trial. We think this is irrelevant, however, because counsel's decision to pursue self-defense was made without an adequate investigation. The point of the duty to investigate is to inform such crucial strategic decisions. Had counsel conducted the necessary investigation, he may well have elected not to present the jury with King's testimony that the shooting stemmed

The state makes much of the state trial court's superior position as a fact-finder. It is certainly true that we must accord a substantial level of deference to factual determinations made in state court. See 28 U.S.C. § 2254(e)(1); Dye v. Stender, 208 F.3d 662, 665 (8th Cir. 2000). However, the issue before us is not resolved by the state trial court's factual determinations that King was competent to stand trial, did not suffer from a mental disease or defect excluding criminal responsibility, and made a rational decision not to pursue a defense of mental disease or defect excluding criminal responsibility. Nor is it sufficient to conclude, as did the Court of Appeals, that the court disbelieved the testimony of Cowan and Logan. This is because, as discussed above, King's mental condition was also admissible to prove that King lacked a mental state that is an element of the offense. Unlike the competency determination, this question must be resolved by the jury. Cf. Antwine, 54 F.3d at 1357, 1365 ("The issue is whether the failure to discover and present evidence of [defendant's] mental condition undermines our confidence in the outcome of . . . the trial. We are concerned, then, with whether the jury--not the motion court--would have found the evidence of [defendant's] mental condition credible.").

The state also argues that Yankoviz was not compelled to seek a second evaluation of his client merely because Robb's report was less than favorable, citing Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995). In Sidebottom, we rejected petitioner's claim that counsel was ineffective for not seeking a second mental evaluation after an initial evaluation concluded that petitioner was not suffering from a mental disease or defect, had no history of mental disease or defect, did not have an abnormal mental condition or mental retardation that would preclude the requisite state of mind for the commission of the crime, and was capable of assisting in his own defense. See id. at 752-54.

---

from a dispute over his brother's buying and selling of children.

Sidebottom is inapposite for two reasons.  First, the initial evaluation conducted in Sidebottom was not limited to an evaluation of the defendant's competency to stand trial or the existence of a mental disease or defect excluding criminal responsibility, but specifically and explicitly considered and rejected a diminished-capacity defense.  See id. at 752.  By contrast, Robb's evaluation contained an opinion about King's mental state at the time of the offense, but was limited to whether King possessed a mental disease or defect completely excluding criminal responsibility.  See Mo. Ann. Stat. § 552.030(1) (West Supp. 2000) ("A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct.").

More importantly, in Sidebottom, counsel's decision not to pursue further mental evaluation was based upon an informed judgment that additional investigation would not uncover an opinion contrary to that produced by the first evaluation.  Sidebottom's attorney  testified that neither his client nor any members of his family had been able to provide any evidence to contradict the findings in the initial psychological report or provide other information concerning mental disease or defect.  As a result, counsel decided there was insufficient evidence for a diminished-capacity defense, and further investigation was unnecessary.  See Sidebottom, 46 F.3d at 753.  Here, however, counsel's decision to forgo a second evaluation was based not upon an informed judgment that further investigation would not yield useful information.  Rather, counsel's decision rested upon the erroneous view that any new information produced by a second evaluation would be useless by virtue of King's determination not to pursue a defense of mental disease or defect excluding responsibility.

In determining whether King was prejudiced by counsel's constitutionally deficient performance, we consider "whether there is a reasonable probability that the defendant would not have been found guilty if counsel's performance had not been

ineffective." Antwine, 54 F.3d at 1365. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

We conclude that counsel's failure to conduct a reasonable investigation into King's mental condition constituted "a breakdown in the adversarial process that our system counts on to produce just results." Id. at 696. If the jury had learned that King had suffered a gunshot wound to the brain and heard testimony regarding the consequences of that injury, there is a reasonable probability that it would have decided there was a reasonable doubt that King knowingly caused or attempted to cause serious physical injury to his brother. Moreover, because counsel failed to obtain and present at trial expert testimony regarding his client's mental impairments, the jury had little choice but to accept or reject King's curious narrative of self-defense at face value, testimony judged by the motion court (and most likely by the jury as well) to be "unbelievable and indicative of consciousness of guilt on movant's part." Evidence of King's mental impairment would have added crucial context to his testimony.

### III. CONCLUSION

Because King was denied his Sixth Amendment right to effective assistance of counsel, and because the state courts failed to hold counsel to the standards enunciated by the Supreme Court and interpreted by this court, we vacate King's sentence for first degree assault[4] and remand to the district court with instructions to issue the writ,

---

[4]Although counsel's failings did not directly taint King's conviction for armed criminal action, it is apparent that King might have received a lesser sentence for that conviction had counsel properly investigated and effectively presented evidence of King's mental condition. We believe it is appropriate to leave King's sentence for armed criminal action intact for the present. To minimize the collateral effects of counsel's deficient performance, however, King must be resentenced if (a) retrial on the assault charge results in a conviction of a lesser offense, or (b) the state elects not to retry King, in which case the sentencing court should assume that the predicate

-14-

unless the State of Missouri commences proceedings to retry him within a reasonable time.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

offense for armed criminal action was a second-degree assault.